Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 18, 2003  Decided January 16, 2004

No. 02-1255

MOUNTAIN COMMUNICATIONS, INC.,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

T–MOBILE USA, INC., ET AL.,
INTERVENORS

On Petition for Review of an Order of the
Federal Communications Commission

*Benjamin J. Aron* argued the cause for petitioner. With him on the briefs was *Robert H. Schwaninger, Jr.*

*Charles W. McKee* argued the cause for Wireless Carrier intervenors T–Mobile USA, Inc., et al., in support of petition-

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

er. With him on the briefs were *Luisa A. Lancetti, Doanne F. Kiechel, Thomas J. Sugrue, David M. Wilson, Laura R. Handman, Jonathan E. Canis,* and *Douglas I. Brandon.*

*Stewart A. Block*, Counsel, Federal Communications Commission, argued the cause for respondents. On the briefs were *R. Hewitt Pate*, Assistant Attorney General, U.S. Department of Justice, *Catherine G. O'Sullivan* and *Nancy C. Garrison*, Attorneys, *John A. Rogovin*, General Counsel, Federal Communications Commission, *John E. Ingle*, Deputy Associate General Counsel, and *Laurel R. Bergold*, Counsel.

*Robert B. McKenna, Jr.* argued the cause for intervenors Qwest Communications International Inc., et al., and *amici curiae* Verizon Telephone Companies. With him on the brief were *Michael E. Glover, John M. Goodman*, and *Edward H. Shakin*.

Before: Sentelle and Garland, *Circuit Judges*, and Silberman, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* Silberman.

Silberman, *Senior Circuit Judge*: Mountain Communications, Inc. is a paging carrier that petitions for review of an FCC order dismissing its complaint against Qwest–the local exchange carrier (LEC) serving the areas where Mountain operates–for charging petitioner two types of fees. The dispute between the carriers as to one of the fees evaporated at oral argument, but we hold that the FCC's decision as to the other was arbitrary and capricious.

## I.

Mountain serves customers in three Colorado local calling areas: Colorado Springs, Walsenburg, and Pueblo. All three local calling areas are within the same Local Access and Transport Area (LATA), and Qwest is the provider of local service within each of those local calling areas. Calls from a Qwest customer to another Qwest customer in the same local calling area are local calls, but if a Qwest customer were to

call from one of these local calling areas to another, he or she would incur a toll.

Though Mountain services all three local calling areas, it uses a single point of interconnection (POI) with Qwest, as it is entitled by statute. *See* 47 U.S.C. § 251(c)(2)(B) (providing that LECs must provide interconnection facilities with other carriers "at any technically feasible point within the [incumbent local exchange] carrier's network"); *see also* 47 C.F.R. § 51.321(a); *In re: Developing a Unified Intercarrier Compensation Regime*, 16 FCCR 9610, 9650–51 ¶ 112 (2001). The POI is located in Pueblo. Customers in each of the three calling areas have pager numbers associated with their individual local calling areas. It is therefore the paging customer's residence that correlates with the paging number, and a call from a telephone in a local calling area to a pager associated with the same local calling area will seem to the calling party to be a local call. But Mountain's maintenance of a single POI in Pueblo, however, means that every call to a Mountain customer, regardless of the place where the call originated, must pass through Pueblo before Qwest hands it off to Mountain and Mountain delivers it to the pager. Thus, a Colorado Springs resident attempting to page a Colorado Springs Mountain customer dials a Colorado Springs exchange, but the call is first routed to Pueblo before being rerouted to Colorado Springs.

Qwest has sought to collect fees from Mountain for these types of calls–calls that originate and terminate in Colorado Springs or Walsenburg but go through Mountain's POI in Pueblo. Qwest considers these calls to be toll calls, but does not charge its own customer–the caller–for placing such calls, perhaps because it lacks the technological ability to do so. *See Starpower Communications, LLC v. Verizon South, Inc.*, 2003 FCC LEXIS 6245, at *23 ¶ 17(Nov. 7, 2003) (attributing such a technological incapacity to Verizon). Instead, Qwest determines whether a customer's call is a toll call by comparing the number of the caller with the number of the person receiving the call. If both are Colorado Springs numbers, Qwest does not charge the customer a toll even if the call is routed to Pueblo and then back to Colorado Springs.

Qwest claimed in response to Mountain's complaint before the FCC that it was entitled to charge Mountain for the tolls it was unable to charge its own customers. According to Qwest, Mountain could avoid the toll charges by establishing a POI in *each* of the three local calling areas–doubtless at an increased cost. Then, if a paging call were placed from a local number to another local number, no toll would be charged to anyone. If, on the other hand, a paging call were made from one local calling area to another, Qwest would transport the call to Mountain's POI–without crossing a local calling area boundary–at which time Mountain would assume responsibility for delivering the call across the local calling areas, presumably at Mountain's expense.

Mountain claimed before the FCC that the Commission's regulations, specifically 47 C.F.R. § 51.703(b), which states that LECs such as Qwest "may not assess charges on any other telecommunications carrier for telecommunications traffic that originates on the LEC's network," prohibit Qwest from charging for transmitting calls from Qwest customers to Mountain's POI. Mountain also relied on a recent FCC decision, *TSR Wireless, LLC v. US West Communications, Inc.*, 15 FCCR 11166, 11184 ¶ 31 (2000), which interpreted that regulation and rejected a similar effort on the part of an LEC to charge a paging carrier for transmitting calls to the paging carriers' POI, where the POI and the caller are in the same LATA but different local calling areas.

The Commission rejected Mountain's contention. The FCC said that in its *TSR* decision it had cautioned,

> nothing prevents [the LEC] from charging its end users for toll calls completed [between local calling areas]. Similarly, section 51.703(b) does not preclude [the paging carrier and the LEC] from entering into wide area calling or reverse billing *arrangements* whereby [the paging carrier] can 'buy down' the cost of such toll calls to make it appear to end users that they have made a local call rather than a toll call.

15 FCCR at 11184 ¶ 31 (emphasis added). This buy-down arrangement is the same concept behind conventional 800 numbers, where the called party is billed for the toll ordinarily incurred by the calling party.

The Commission concluded that here, by establishing a POI in Pueblo and then asking Qwest for lines to connect local customer numbers in Walsenburg, Colorado Springs, and Pueblo to the POI, Mountain made it appear to Qwest customers that they were making local calls from Colorado Springs numbers to Colorado Springs paging numbers–even though they passed through a Pueblo POI. "By configuring its interconnection arrangement in this manner, Mountain prevents Qwest from charging its customers for what would ordinarily be toll calls to access Mountain's network." *Mountain Communications, Inc. v. Qwest Communications Int'l, Inc.*, 17 FCCR 15135, 15138 ¶ 5 (2002). The Commission determined that Mountain had obtained a wide area calling *service*, which is similar to a wide area calling arrangement, and therefore Qwest was entitled to charge Mountain for that service.

## II.

Although petitioner does not quarrel with the Commission's caveat in *TSR*–that the regulation does not prohibit a wide area calling arrangement–it insists that this case is no different than *TSR*; the Commission has simply turned 180 degrees without explanation, and adopted a position at odds with its own regulation and the statutory provision allowing Mountain to make use of one POI within a LATA. We are befuddled at the Commission's efforts to explain away its *TSR* decision; the facts seem–and are conceded to be–identical, but the results are opposite. In *TSR*, the FCC prohibited US West, the LEC, from charging TSR, the paging carrier, for the costs of transporting calls from US West customers to TSR's POI.[1] In that case, just as in the present situation, the paging carrier served separate local calling

---

[1] US West was the predecessor company to Qwest, the LEC involved in the present dispute.

areas (Yuma and Flagstaff, Arizona), both of which were within the same LATA and served by the same LEC. TSR used a single POI, and a US West customer wishing to page a TSR customer within the same local calling area would have to place a call that would be routed across local calling area boundaries. US West attempted, as Qwest attempts here, to charge the paging carrier a fee for transporting those calls to the paging carrier's POI. The FCC ruled that such a charge would violate 47 C.F.R. § 51.703(b), because the calls *originated* on US West's network, and an LEC may not charge another carrier for traffic originating on the LEC's network. *See TSR*, 15 FCCR at 11176 ¶ 18, 11181 ¶ 25, 11184 ¶ 31.[2] The FCC concedes that the facts of *TSR* are identical to those presented here, but argues that the present network configuration nevertheless may be considered wide area calling, even if the same configuration in *TSR* was not so considered.

The Commission's attempt to stretch the concept of a wide area calling arrangement (essentially an agreement) to a wide area calling "service" is logically inconsistent with its *TSR* decision.[3] The premise, according to the Commission's *TSR*

---

[2] In the words of the Commission, "[s]ection 51.703(b), when read in conjunction with Section 51.701(b)(2), requires LECs to deliver, without charge, traffic to [wireless] providers anywhere within the MTA [Major Trading Area] in which the call originated...." *TSR*, 15 FCCR at 11184 ¶ 31. An MTA is the area within which wireless providers offer service, and within which the FCC's reciprocal compensation rules apply. All three local calling areas at issue here are within the same MTA. Section 51.701(b)(2), to which the Commission referred, defines "telecommunications traffic" as that traffic "exchanged between a LEC and a [wireless] provider that, at the beginning of the call, originates and terminates within the same Major Trading Area, as defined in § 24.202(a) of this chapter."

[3] Mountain argues that under Qwest's tariffs, wide area calling services exist only where the wireless carrier uses an interconnection known as Type 2. Mountain uses a Type 1 interconnection, which differs from Type 2 in that Mountain's customers have telephone numbers associated with their individual local calling

reasoning, of a wide area calling arrangement is that the LEC can charge a toll call to its customers. In that event the paging carrier has an incentive to "buy down" that charge so that Qwest's customer is not deterred by the toll from making a paging call. Here, for reasons not entirely clear to us, Qwest does not charge its customers for what it regards as a toll call if the originating number and the paging number are in the same local calling area. *See generally Starpower Communications*, 2003 FCC LEXIS 6245 at *23 ¶ 17 (Nov. 7, 2003) (noting that "industry practice among local exchange carriers . . . appears to have been that calls are designated as either local or toll by comparing the [phone numbers] of the calling and called parties").[4] Accordingly, Mountain has no incentive to enter into a wide area calling arrangement with Qwest. Mountain's system of interconnection provides it no advantages other than those to which, presumably, it is entitled for free.[5] The Commission nevertheless chooses to

───────

areas instead of having numbers associated with the location of the POI, here, Pueblo. Before us, the FCC denies that there is any distinction between Type 1 and Type 2 interconnections for the purpose of establishing whether there is a wide area calling arrangement. We need not decide whether there can be a wide area calling arrangement in a Type 1 system, and our analysis does not turn on a conception of wide area calling being limited to Type 2 systems.

[4] Mountain further argues that Qwest would not legally be permitted to charge for calls by Qwest customers to paging customers with numbers in the same local calling area as the caller. *See* 47 U.S.C. § 153(48) (allowing a "separate charge" beyond that required for local service for "telephone service *between* stations in different exchange areas") (emphasis added); 47 C.F.R. § 51.701(d) (defining a call's termination as the point at which the call is delivered to the called party). We need not decide whether the FCC could reasonably interpret the statute and regulation to allow a toll where a call begins and ends within a single local calling area but passes through a different one.

[5] Neither in *TSR* nor in this case has the Commission suggested, or has Qwest claimed, that Qwest had any right to refuse to allow

term what Mountain has ordered from Qwest as wide area calling "*service*," which presto becomes a reasonable facsimile of a wide area calling *agreement*. The FCC's characterization of Mountain's arrangement as a wide area calling "service,"–sort of a constructive agreement–is rendered even more dubious by the fact that there are no additional services provided by wide area calling. The only difference between wide area calling and traditional telephony is the entity billed for the tolls.

Unfortunately for the Commission, the exact same analysis could have been applied in *TSR*–but was implicitly rejected. Therefore the Commission has, just as Mountain has claimed, changed direction without explanation, indeed without even acknowledging the change.

Perhaps more fundamental, by abandoning the concept of a buy-down agreement between the parties and simply designating the service Mountain obtained as a wide area calling service, the Commission seemingly comes into direct conflict with its own regulation. *See MCImetro Access Transmission Servs. v. BellSouth Telecomms, Inc.*, No. 03–1238, 2003 U.S. App. LEXIS 25782, at *24 (4th Cir. Dec. 18, 2003) (holding that 47 C.F.R. § 51.703(b) "unequivocal[ly] prohibit[s] LECs from levying charges for traffic originating on their own networks, and, by its own terms, admits of no exceptions"). In *TSR*, the Commission had interpreted its regulation 51.703(b), which prohibits LECs from assessing *charges* on other carriers for delivering traffic originating on the LEC's network, as not applying to a voluntary *agreement* that a paging carrier enters into with the LEC to compensate the LEC for foregoing its option to charge its customers. In other words, the Commission implicitly construed such an agreement as not a "charge" for telecommunications traffic but rather compensation for a separate benefit. The Commission described "wide area calling" as "a service in which a

---

Mountain to obtain paging numbers associated with each local calling area. *See In re: Numbering Resource Optimization*, 15 FCCR 7574, 7577 n.2 (2000) ("A carrier must obtain a central office code [the first three digits of a seven-digit phone number] for each rate center in which it provides service in a given area code.").

LEC *agrees* with an interconnector not to assess toll charges on calls from the LEC's end users to the interconnector's end users, *in exchange for which* the interconnector pays the LEC a per-minute fee to recover the LEC's toll carriage costs." *TSR*, 15 FCCR at 11167 n.6 (emphasis added). But in this case the Commission abandoned that construction, instead allowing Qwest to *charge* Mountain for the wide area calling service it was deemed to enjoy, though there was no agreement. By shifting its characterization of the exception to § 51.703(b)'s prohibition on charges from an agreement to compensate LECs for a foregone opportunity, to a *charge* for the telecommunications traffic, the FCC decision appears to run afoul of § 51.703(b)'s prohibition on charges.

The Commission, moreover, has not even tried to explain how its position can be reconciled with the statutory provision, 47 U.S.C. § 251(c)(2)(B), which, it will be recalled, obliges an LEC to provide interconnection facilities with any other carrier at a single "technically feasible" POI. Mountain maintains that that statutory provision implicitly precludes an LEC from charging for such an interconnection, and the Commission has not responded to that argument. We do not, therefore, decide whether the Commission could reasonably interpret the statute to allow for such charges.

We therefore rather easily conclude that the Commission's decision on this issue is arbitrary and capricious. *See generally, e.g., Ramaprakash v. FAA*, 346 F.3d 1121, 1124–25 (D.C. Cir. 2003).

III.

In addition to the charges Qwest has assessed for delivering Qwest-originated calls to Mountain's POI, Qwest has also assessed "transit" charges for the delivery of calls originated by a customer of an entirely different network. If a non-Qwest customer wishes to page a Mountain customer, the call is routed to Qwest. Qwest then carries the call on its network–in like manner as if a Qwest customer had placed the call–to Mountain's POI. Mountain then assumes respon-

sibility for delivering the call to the Mountain customer. Qwest incurs costs for switching and routing these calls over the Qwest network, and Qwest charged Mountain for the last of five parts of those expenses–the cost of delivering the call from the Qwest end office switch to Mountain's POI. The FCC allowed Qwest to charge for this service, but indicated that Mountain could seek reimbursement from the originating carrier for whatever charges it paid to Qwest. *See Mountain Communications*, 17 FCCR at 15137 n.13. Mountain's petition challenged this FCC decision as well, claiming that the charge is arbitrary and capricious because it does not follow the standard practice of charging the cost of calls to the network of the party initiating the call. Mountain insisted that the prospect of reimbursement from the originating carrier was illusory, because Mountain never receives information from Qwest about which carrier initiates any individual call, and it is therefore impossible for Mountain to seek reimbursement from a third carrier.

It is undisputed that Qwest need not absorb these costs; the only question is whether Qwest can charge Mountain for one of the five portions of this cost or must instead look to the originating carrier for all of the costs. It might well be reasonable for the Commission to authorize Qwest to apportion those costs, but we do not understand why the Commission did so. It did not explain why it rejected Mountain's contention that the originating carrier should be charged for all the costs. In any event, by indicating that Mountain could charge the originating carrier, it suggested that Mountain was essentially correct in claiming that the originating carrier should bear *all* the transport costs. At oral argument, Qwest's counsel obviated any need for us to decide this issue by indicating that Qwest would provide Mountain with the information necessary so that Mountain could charge the originating carrier for reimbursement. Under those circumstances, Mountain dropped that part of its petition.

\* \* \* \* \*

Accordingly, the Commission's order is vacated in part and the case is remanded.